Filed 8/10/16  San Bernardino Valley Municipal Water Dist. v. San Gabriel Valley Water Co. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SAN BERNARDINO VALLEY MUNICIPAL WATER DISTRICT et al., | |
| Plaintiffs and Respondents, | E063180 |
| v. | (Super.Ct.No. CIVDS1311085) |
| SAN GABRIEL VALLEY WATER COMPANY et al., | OPINION |
| Defendants and Appellants; | |
| CUCAMONGA VALLEY WATER DISTRICT, | |
| Intervenor and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Bryan Foster, Judge.  Affirmed.

Nossaman, Frederic A. Fudacz, Henry S. Weinstock, Thomas D. Long and Gina R. Nicholls for Defendants and Appellants San Gabriel Valley Water Company, Fontana Water Company and Fontana Union Water Company.

Lagerlof, Senecal, Gosney & Kruse, Thomas S. Bunn III and Jenny S. Kim for Intervenor and Appellant, Cucamonga Valley Water District.

Downey Brand, David R.E. Aladjem, M. Max Steinheimer and Meredith E. Nikkel for Plaintiff and Respondent San Bernardino Valley Municipal Water District

Skapik Law Group, Geralyn L. Skapik, Mark C. Allen and Blair J. Berkley for Plaintiff and Respondent City of Colton.

Aleshire & Wynder, Fred Galante, Stephen R. Onstot and Miles P. Hogan for Plaintiff and Respondent City of Rialto.

Redwine & Sherrill, Gerald W. Eagans, Steven B. Abbott, Julianna K. Tillquist; Rutan & Tucker, David B. Cosgrove; Larson O'Brien, Stephen G. Larson and Paul A. Rigali for Plaintiff and Respondent West Valley Water District.

I

INTRODUCTION

All the parties involved in this appeal are water utilities, claiming groundwater pumping rights to the Rialto Basin located in southwestern San Bernardino County. In

2

1961, the parties, or their predecessors, agreed to a stipulated judgment, the 1961 Decree, establishing a plan for groundwater pumping rights within the Basin.[1]

In February 2015, the San Bernardino County Superior Court granted a preliminary injunction, limiting the groundwater pumping rights in the Basin to a maximum of 2,520 acre-feet per year by appellants and defendants[2] during drought years, as provided under the 1961 Decree. Appellants argue that plaintiffs and respondents[3] have not shown the likelihood of success on the merits and have failed to prove imminent, irreparable, or any harm caused by appellants' pumping. Appellants urge that

---

[1] "California uses more groundwater 'than any other state and overdrafts as much as 1.4 million acre feet in a normal year.' But what is groundwater? And what is overdraft? Groundwater is water that seeps into the ground and collects in the spaces between the grains of gravel, sand, silt, or clay, or settles into fractured rock. . . . The unsaturated zone, which is the distance between the land surface and the top of the groundwater (also called the 'water table'), can range from a few feet to hundreds of feet, depending on the location. Areas with significant volumes of groundwater are called aquifers. . . . Aquifers are also called groundwater basins. Groundwater basins are recharged—refilled—when rain, river water, or agricultural irrigation water seeps down through the unsaturated zone to the water table. A groundwater basin is in 'overdraft' when 'the amount of water withdrawn by pumping exceeds the amount of water that recharges the basin over a period of years' under average conditions. [Fns. omitted.]" (Tina Cannon Leahy, Desperate Times Call for Sensible Measures: The Making of the California Sustainable Groundwater Management Act (2015) 9 Golden Gate U. Envtl. L.J. 5, 7-8.)

[2] Fontana Union Water Company (Fontana Union), Fontana Water Company (Fontana Water), San Gabriel Valley Water Company (San Gabriel), and Cucamonga Valley Water District (Cucamonga).

[3] San Bernardino Valley Municipal Water District (San Bernardino), West Valley Water District (West Valley), City of Colton, and City of Rialto.

the order granting the preliminary injunction should be reversed.  We conclude the trial court did not abuse its discretion in granting the preliminary injunction and we affirm the order of the lower court.[4]

## II

## FACTUAL AND PROCEDURAL BACKGROUND

The 1961 Decree applies to the Rialto Basin.  In 1961, six entities, including Colton, Rialto, and Fontana Union, claimed an interest in the Basin.  The parties now affected by the 1961 Decree include respondents West Valley, Colton, and Rialto, and appellants Fontana Union, Fontana Water, San Gabriel, and Cucamonga.  Respondent San Bernardino is not a party or a successor to a party to the 1961 Decree.

The 1961 decree defines a "water year" as the 12-month period beginning October 1 and ending September 30.  The parties disagree about whether production limits are imposed retroactively to October or prospectively after May of each water year.

In March, April, and May of each water year, three index wells are measured to establish the average spring high-water level.  The 1961 Decree describes three permitted levels of production based on the spring high-water level for a particular water year:

---

[4] We grant the request for judicial notice filed on May 29, 2015.  We deny the request for judicial notice filed on October 26, 2015.  We recognize, however, that the California Water Plan, including Bulletin No. 3, are established by statute at Water Code section 10004.

4

1)  If the spring high-water level is high, above 1002.3 feet above mean sea level, unlimited pumping is allowed:  "no stipulating party shall be limited in the amount of water which may be pumped from the Basin."

2)  If the spring high-water level is middle, between 1,002.3 and 969.7 feet above mean sea level, then each party is entitled to pump a certain amount, as defined in paragraph 5 of the 1961 Decree, during the water year.

3)  If the spring high-water level is low, below 969.7 feet above mean sea level, then the amount of water each party is entitled to extract, as set forth in paragraph 5, shall be reduced by one percent for each one foot below 969.7 feet above mean sea level, up to a cumulative reduction of 50 percent.

Paragraph 5 of 1961 Decree entitles Fontana Union to pump 550 acre-feet.  In addition, Fontana Union is entitled to pump an additional 370 acre-feet in connection with its acquisition of well No. D-1166, and another 1,600 acre-feet during dry years under a Standby Water Lease with Rialto.[5]  During middle-level years, Fontana Union's defined annual entitlement is limited to 2,520 acre feet.  The maximum 50 percent cutback during low-level years would allow Fontana Union to pump only 2,245 acre-feet

_____

[5] In the year 2000, Fontana Union and Rialto negotiated and entered into a Standby Water Lease.  As part of a plan for landfill contamination remediation, Rialto agreed to lease up to 1,600 acre-feet per year of its Rialto Basin pumping rights to Fontana Union for use by San Gabriel, during any period of pumping limitation required by the 1961 Decree.

annually.  In other words, except in high-level water years, appellants are only entitled to pump between 2,245 and 2,520 acre-feet.  It is not disputed that appellants seeks to produce thousands more than 2,520 acre-feet every year.

For many years, the Basin's average spring high-water water levels remained high, above 1,002.3 feet above mean sea level, allowing for unlimited groundwater pumping.  Before 2003, appellants pumped between 2,000 and 3,000 acre-feet per year.  In and after 2003, appellants pumped between 5,000 and 9,000 acre-feet per year.  In 2009, the water levels were low, below 969.7 feet, limiting appellants' pumping rights to 2,520 acre feet or less.

In 2014, the average spring high water-level was 942.99 feet above mean sea level, meaning appellants were limited to pumping 2,371.5 acre-feet during the 2013/2014 water year.  Instead, appellants extracted 7,718.040 acre-feet from the Basin.  On January 17, 2015, Governor Brown declared a drought state of emergency in California.[6]  As of January 2015, appellants had already extracted more than 2,371.5 acre-feet in the first four months of the 2014/2015 water year.

Admittedly, appellants have pumped far more than the allotment permitted under the 1961 Decree.  Respondents contend appellants' excessive pumping has harmed respondents by reducing the amount of water available to maintain healthy conditions in

---

[6] Edmund G. Brown Jr., Office of Governor of Cal., A Proclamation of a State of Emergency (Jan. 17, 2015).

the Basin.  In their second amended complaint, respondents allege equitable, tort, contractual, and constitutional causes of action against appellants for violation of the 1961 Decree.  Respondents specifically allege that appellants have pumped, and continue to pump, excessive and unreasonable amounts of groundwater from the Rialto Basin.

Appellants filed a cross-complaint seeking modification of the 1961 Decree based on changed circumstances, including the requirement under the California Constitution, Article X, Section 2,[7] in appellants' words to adopt a "modern physical solution" "to maximize the beneficial use of the Rialto Basin's water resources and storage space." Appellants particularly object to pumping being governed by measuring spring high-water levels at the three index wells, as provided by the 1961 Decree.

In September 2014, respondents filed a motion for a preliminary injunction against appellants.  In support of the motion, respondents contended that low water levels in the Basin would require respondents to obtain alternative water supplies to meet consumer demands.  As part of the motion, the declarations of Peter J. Fox, Rialto's water

---

[7] "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare.  The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (Cal. Const., art. X, § 2.)

7

superintendent, and Ken Sikorski, West Valley's water superintendent, submitted evidence of low water level readings at the index wells. Marcus L. Fuller, the Public Works Director and City Engineer for Rialto, asserted that declining water levels, combined with existing drought conditions, generated significant uncertainty as to whether sufficient groundwater would meet consumer needs.

In February 2015, the trial court granted a preliminary injunction prohibiting appellants from pumping more than 2,520 acre-feet from the Basin.

III

DISCUSSION

We frame our discussion according to several controlling premises. First, this appeal involves the propriety of a preliminary prohibitory injunction, not a judgment granting a permanent injunction. For that reason, many of the arguments made by the parties may be more properly considered at trial and not during a pretrial motion. An injunction will serve to protect the status quo until the technically complex record is more fully developed at trial. Second, on its face, until it is modified or invalidated, the 1961 Decree restricts appellants' levels of water production under certain circumstances. Third, it is undisputed that appellants have exceeded their allotted pumping rights since 2009, although appellants insist they should be allowed to continue to do so.

After reviewing appellants' submissions to this court, we conclude that their goal in opposing the preliminary injunction is actually, as set forth in their cross-complaint, to

8

modify or negate the 1961 Decree and to eliminate the pumping limitations imposed by the decree.  Instead, we determine that the 1961 Decree applies according to its terms, and therefore the trial court did not abuse its discretion in granting a preliminary injunction prohibiting appellants from violating the 1961 Decree.

*A.  Standard of Review*

The parties disagree about the proper standard of review.  Respondents contend the decision to grant a preliminary injunction rests in the sound discretion of the trial court and the trial court only abuses its discretion when it has """"exceeded the bounds of reason or contravened the uncontradicted evidence."""" (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.)  Appellants maintain a "heightened scrutiny" standard is required for a mandatory, not prohibitory, injunction.  The latter claim was rejected by this court on appellants' earlier petition for writ of supersedeas.  Furthermore, "the general rule is that an injunction is prohibitory if it requires a person to refrain from a particular act and mandatory if it compels performance of an affirmative act that changes the position of the parties." (*Davenport v. Blue Cross of California* (1997) 52 Cal.App.4th 435, 446.)

An injunction designed to preserve the status quo between the parties and to restrain illegal conduct is prohibitory, not mandatory, and does not require heightened appellate scrutiny.  (*People et rel. Brown v. iMergent, Inc.* (2009) 170 Cal.App.4th 333, 342-343; *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1048.)  Appellants cannot rely, as

9

they seek to do, on *City of Pasadena v. City of Alhambra* (1946) 75 Cal.App.2d 91, 95, or *Orange County Water District v. City of Riverside* (1959) 173 Cal.App.2d 137, 222-226 (OCWD) , because those cases involved the standard of review for a judgment for an injunction, not a preliminary injunction.

Unlike the mandatory injunction in *People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, the preliminary injunction here does not mandate affirmative acts but rather prohibits appellants from pumping water in excess of their rights under the 1961 Decree. We reject the assertion that requiring appellants to keep monthly pumping records converts this into a mandatory injunction. Instead, we hold heightened scrutiny is not required in evaluating the two significant factors in granting a preliminary injunction: (1) the likelihood of prevailing on the merits at trial, and (2) the balancing of harm between the parties. (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.) "[T]he burden is on the party challenging the preliminary injunction to prove it was improperly granted." (*Costa Mesa City Employees Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 306.)

B. *Preliminary Injunction*

In granting the preliminary injunction, the trial court expressly found respondents were likely to prevail on the merits and would suffer greater harm if the injunction was denied than appellants would suffer if the injunction was issued:

"[Respondents] have met their burden of showing that they will probably prevail in their action against the [appellants] based on the [appellants'] failure to comply with the terms of the stipulated judgment and that the harm that the [respondents] will suffer if the [appellants] are not enjoined from violating the stipulated judgment will exceed the harm that will be suffered by the [appellants] if they are required to comply with the terms of that judgment and the court should grant the [respondents'] request for a preliminary injunction preventing the [appellants] from pumping amounts of water from the Rialto Basin that exceed the amounts permitted under the 1961 Decree."

On appeal, appellants primarily argue that respondents failed to establish there was imminent, irreparable, or any harm caused by appellants' pumping exceeding the limits of the 1961 Decree. (*Katz v. Walkinshaw* (1903) 141 Cal. 116, 136.) We are not persuaded by appellants. We conclude that respondents have established both prongs entitling them to injunctive relief and the trial court did not abuse its discretion in granting such relief.

*1. Likelihood of Success*

At the outset, we agree with the trial court's finding that respondents are likely to prevail in showing that appellants are violating the clear provisions of the 1961 Decree. Paragraph 5 of the 1961 Decree sets forth in plain terms Fontana Union's annual pumping rights in the Basin: unlimited when water levels are high; restricted when water levels are low or middle level. Appellants admit they pump in excess of their entitlement

11

in the 1961 Decree. For example, for the two water years, October 1, 2012-September 30, 2014, appellants pumped "a total of slightly more than 7,000 acre-feet per year." In January 2015, appellants admitted that Fontana Water Company had "already pumped more than 2,371.5 acre-feet" for the 2014/2015 water year. It is undisputed that appellants have often exceeded the pumping limits in the past and would continue to exceed the annual limit of 2,520 acre-feet in the future.

Instead of accepting the limits imposed by the 1961 Decree, appellants argue for a variety of reasons that they should not be bound by the decree's terms. Appellants insist they are entitled by several circumstances to produce more water than set forth in the decree. Initially, appellants contend that the 1961 Decree actually should be interpreted to allow unlimited pumping for about eight months from October 1 until after the average spring high-water levels are established in May. In other words, as described by the trial court, the 1961 Decree "only places limits on their water pumping after each spring's measurements of the index wells and thus the limits only apply during dry years and only during the summer." As recognized by the trial court, such an interpretation is completely at odds with the intent of the 1961 Decree to establish *annual* limits on production in drier years.

Appellants also argue that the 1961 Decree should be modified by the subsequent Standby Water Lease, which was executed between Rialto and Fontana Union in 2000 as part of a groundwater remediation plan for landfill contamination. The lease entitles

12

Fontana Union to an additional 1,600 acre-feet per year but does not modify the 1961 Decree. Instead, the Standby Water lease incorporates the annual limits of the 1961 Decree: "The lease of water rights will allow San Gabriel to produce water at such times as Fontana Union's water rights in the Rialto Basin are limited or curtailed pursuant to the Rialto Judgment (being when the Rialto Basin's 3 index wells average mean sea level elevation falls below 1,002.3 feet when measured in March, April, and May of any year during the term of this Lease)." The meaning of the 1961 Decree is clear on its face and the Standby Water Lease does not allow greater pumping rights than the 1961 Decree. Because appellants cannot produce more water than permitted by the decree, the trial court correctly found respondents were likely to succeed on their claims.

We do not agree with appellants that the present and future harm caused by overproduction from the Basin is ameliorated or excused by respondents' purported 10-year delay in seeking an injunction. The parties under the 1961 Decree waived their right to assert laches or statute of limitations as a defense to any claim of excessive pumping: "each stipulating party hereby waives as against each other stipulating party the right to plead any statute of limitation or laches with respect to water extracted by such party in excess of such amount."

Furthermore, any lapse in time does not excuse appellants' recent and future violations of the 1961 Decree. It was not until the summer of 2009 that average water levels in the Basin dipped below 969.7 feet—the level at which graduated percentage

13

reductions were triggered under the 1961 Decree. Since then average water levels in the Basin have fallen below 950 feet. An aggrieved party is not required to seek an injunction precipitously. Respondents and appellants tried to resolve this conflict before respondents filed their action in September 2013. Respondents should not be penalized for their efforts to resolve a dispute before initiating litigation. (*Youngblood v. Wilcox* (1989) 207 Cal.App.3d 1368, 1376.) Given current drought conditions and declining water levels in the Basin, the preliminary injunction is necessary to protect the Basin and all its customers who rely on the Basin for water. Therefore, the trial court did not abuse its discretion in rejecting appellants' argument that, because of delay, the injunction is not necessary to prevent harm now or in the future.

## 2. *Balancing of Respective Harms*

In spite of the likely success of respondents' claims, appellants also assert that respondents did not show imminent harm or comparatively greater harm than appellants. Appellants challenge the evidentiary foundation of respondents' motion by arguing that insufficient admissible evidence establishes that pumping by appellants has caused the water levels in the Rialto Basin to become lower over time. However, water level readings at the three index wells are established directly by the declarations of Fox and Sikorski, the two water officials. Appellants themselves relied on the subject data in opposing the preliminary injunction. There is no plausible dispute about there being lower water levels in the Basin.

14

Furthermore, appellants admit the trial court's finding that reductions of the 1961 Decree were triggered in past years although appellants have usually pumped more than 7,000 acre-feet annually. For these reasons, we find it unnecessary to resolve the parties' dispute about whether the trial court could properly rely on the allegations of the second amended complaint, in addition to the declarations of public officials. The admissible evidence submitted by respondents in support of the motion was sufficient to justify the preliminary injunction.

Next, appellants assert an injunction is not proper because respondents failed to prove that it has been appellants' pumping causing harm to respondents, even if there are lower water levels. The material issue in this case is whether appellants' overproduction from the Basin adversely affects respondents by reducing supply in the Basin. Where water rights are an issue, "[i]rreparable damage may . . . be sustained from whatever makes the supply less dependable, less satisfactory in its quality or permanently more expensive." (*OCWD, supra,* 173 Ca1.App.2d at p. 216.) In *OCWD*, the court evaluated the allegation that certain cities were pumping in excess of their rights and held that "the lowering of the water table in the district is resulting and will result in irreparable damage." (*Ibid.*) The court held that overproduction of water was wrongful and "is in a substantial degree one of the causes of the damage." (*Id.* at pp. 216-217.)

The evidence shows that, in the years when water levels at the index wells were lower, the Basin water table correspondingly declined, causing respondents to restrict

their own pumping under the terms of the 1961 Decree. During this time, appellants annually extracted more than double the quantity of water to which they were entitled under the 1961 Decree. Even though appellants insist there may be other causes for reduced Basin groundwater levels, such as drought and contamination. Based on this evidence, excessive pumping by appellants causes harm to respondents by contributing to the Basin's declining groundwater levels.

Furthermore, water officials for respondents have attested to the lower water levels in the Basin and that respondents have been compelled to undertake remedial measure to address the situation caused by the decrease, including the purchase of alternative imported water supplies. To paraphrase an observation of the *OCWD* court, it must not be forgotten, that respondents are as much the representative of a public interest as are appellants and appellants cannot be permitted to go on with indefinite and ever increasing enlargement of their appropriations despite the absence of surplus water. (*OCWD¸ supra,* 173 Cal.App.2d at p. 223.)

Appellants next argue the preliminary injunction will harm the public interest by limiting appellant's ability to provide reliable water supplies, raising customers' water bills, and preventing remedial pumping at Well F-49. However, there can be no public interest in allowing illegal acts to continue. In *Loma Portal Civic Club v. American Airlines, Inc*. (1964) 61 Cal.2d 582, 588, the Supreme Court denied a permanent injunction based on public policy only where there was no claim of a violation of federal

16

law.  In *Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1472, the court weighed defendants' public interest activities against evidence that any harm could readily be redressed by compensatory damages and held that a preliminary injunction was therefore not appropriate.  Here, not only did appellants clearly violate the 1961 Decree, but the harm to respondents and the reliability of water supply in the Basin in general is not readily redressed by compensatory damages and itself is contrary to the public interest.

The "huge" costs claimed by appellants are speculative and not supported by the record.  Respondents have persuasively countered by explaining that appellants may acquire alternative water supplies from the Chino Basin and can absorb those costs in their operating budget without increasing customer rates.  Fontana Water's own Urban Water Management Plan demonstrates Fontana Water currently operates only 11 of its 18 active wells in the Chino Basin with a reduced capacity of 24,500 gallons per minute, or approximately 35.2 million gallons per day.  Therefore, the trial court correctly balanced appellants' increased costs against the harm by excessive pumping from the Basin to find in favor of respondents.

There is also no evidence in the record that restricting pumping will harm appellants' remediation efforts.  In 1998, the RWQCB[8] issued Cleanup and Abatement

---

[8]  Regional Water Quality Control Board.

17

Order No. 98-96 (the CAO) to address contamination from the Mid-Valley Sanitary Landfill, operated by the County of San Bernardino. The CAO required the county to "intercept and control the VOC[9] plume at [the Landfill]" and to develop and submit plans for a corrective action system and corrective action program.

The CAO does not require appellants to pump any amount of water from Well F-49 located in the Rialto Basin. Appellants' assertion to the contrary is unfounded. Under the Standby Water Lease, Fontana Union agreed it would try to operate Well F-49 to treat not less than 2,000 gallons per minute. However, the County specifically agreed that Fontana Union should operate Well F-49 according to its water rights under the Standby Water Lease, which incorporates the restrictions of the 1961 decree. Additionally, the County agreed that remediation could occur under "natural attenuation"—no pumping at all—or only 1,000 gallons per minute rather than the 2,000 gallons per minute. The County has noted that water produced from Well F-49 is "now consistently below the state drinking water standards for all chemicals of concern," signifying remediation has been accomplished. In any case, the remediation issue must be resolved by the RWQCB in consultation with the County, not by the court in an action between other parties.

Cucamonga separately argues that, because it sells its share of Fontana Union's water, it will be forced to recoup lost revenue by raising water rates on its customers.

---

[9] Volatile organic compound.

18

Cucamonga's argument is unsupported in the record, and does not outweigh the harm to respondents and the groundwater supply generally: "When the doctrine of relative hardship or balancing conveniences is invoked as a defense to injunctive relief, proof of irreparable injury to defendant is a necessary element of the defense." (*Volpicelli v. Jared Sydney Torrance Memorial Hosp.* (1980) 109 Cal.App.3d 242, 252.) In *Volpicelli*, the Court of Appeal affirmed a preliminary injunction where the "array of purported hardships" asserted by defendants were "untenable and completely lacking in merit." (*Ibid.*) Cucamonga's speculative claim of economic harm pales compared to the harm to respondents' rights to pump under the 1961 Decree and the harm to the supply of groundwater in the Basin in general. For these reasons, the trial court did not abuse its discretion in finding that harm to respondents would be greater from denial of the preliminary injunction than appellants are likely to suffer if the injunction was issued.

*3. No Imminent Harm*

Notwithstanding respondents' plain showing of harm, they would still be entitled to a preliminary injunction, even in the absence of imminent harm. Section 526, subdivision (a)(1), of the Code of Civil Procedure provides an injunction may be granted: "When it appears by the complaint that the plaintiff is entitled to the relief demanded, and the relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually." In *White v. Davis* (2003) 30 Cal.4th 528, the court held "a trial court may grant a preliminary injunction upon a

19

sufficiently strong showing of likelihood of success even when the party seeking the injunction cannot show that the balance of harms 'tips' in its favor." (*Id.* at p. 561.) *Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd., supra*, 23 Ca1.App.4th at page 1471, acknowledges that "irreparable injury" is just one way to express the requirement that a trial court consider "potential harm" in deciding whether to issue a preliminary injunction.

The same principles operated in *Fresno Canal & Irrigation Co. v. People's Ditch Co.* (1917) 174 Cal. 441, involving the wrongful diversion of water and a preliminary injunction to "restrain a repetition or continuation of the injury being done to plaintiffs," (*id*. at p. 450) without there being a finding of irreparable harm. Just as plaintiffs in *Fresno Canal* were entitled to an injunction to restrain defendants, respondents are entitled to an injunction to restrain appellants according to the terms of the 1961 Decree. Analogously, the Supreme Court has held a riparian owner is entitled to enjoin others from taking water so as improperly to injure him. (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 550-554.)

None of the cases cited by appellants stand for the proposition that irreparable or imminent harm is a necessary finding for the issuance of a preliminary injunction in contrast to a permanent injunction.[10] The cases of *Thompson v. Kraft Cheese Co. of*

---

[10] The federal cases cited by Cucamonga are inapplicable because they were decided under federal procedural law, not California law. Even if irreparable harm is a

*California* (1930) 210 Cal. 171, *Rancho Santa Margarita v. Vail, supra,* 11 Ca1.2d 501, and *East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, all involve permanent injunctions where the factors for issuance of a preliminary injunction are distinct from permanent injunctive relief. (See *Cohen v. Board of Supervisors, supra,* 40 Cal.3d at p. 286.) However, even in *Vail*, the court acknowledged an injunction is proper when, as here, appellants claimed the right to take more water than they were legally entitled to and injured respondent as a result. (*Vail*, at p. 550.) Here the preliminary injunction prohibits these appellants from pumping beyond their right under the 1961 Decree. Even without imminent harm, the trial court correctly found in respondents' favor.

*4. Other Contentions*

Appellants maintain there are myriad causes for declining water levels in the Rialto Basin, including drought, groundwater remediation, respondents' own pumping, and basin outflows, all of which require more comprehensive expert analysis and evidence before an injunction is granted. None of these putative alternative causes serve to offset the undisputed fact that appellants are violating the limits of the 1961 Decree.

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
required element for a preliminary injunction to issue under federal law, the California Supreme Court has noted that factors such as irreparable harm are simply a different way of describing the "interim harm" factor. (*Cohen v. Board of Supervisors, supra,* 40 Cal.3d at p. 286, fn. 5.)

First, the present drought makes compliance with the 1961 Decree's terms even more important. Second, the need for groundwater remediation as agreed upon by the RWQCB, the County, Fontana Union, and Rialto is an issue separate from the 1961 Decree. Next, the record shows respondents have offset their own pumping after 2003 by importing 113,672 acre-feet of water between 1990 and 2010. Additionally, when groundwater levels fell in 2009, respondents reduced extractions from the Basin as called for by the 1961 Decree.

Appellants also contend there is surplus water "outflow" from the Rialto Basin in the amount of 20,000 acre-feet per year which should be available for pumping. However, even if such surplus water were available,[11] appellants have no right to pump such surplus water under the express terms of the 1961 Decree.

Before 2003, appellants pumped approximately between 2,000 and 3,000 acre-feet annually. Since 2003, appellants have pumped between 5,000 and 9,000 acre-feet per year. Thus, after appellants' increased pumping since 2003, groundwater levels have fallen as anticipated by the 1961 Decree. In summary, appellants assert a number of theories as to why groundwater levels in the Rialto Basin have fallen since 2003 but appellants can scarcely deny their pumping since 2003 has not contributed to depleting the water supply in the Rialto Basin.

---

[11] Any surplus water is subject to prior appropriation by third parties. (*Katz v. Walkinshaw, supra,* 141 Cal. at pp. 135-136.)

22

*5. No Adequate Remedy*

Appellants also argue that respondents failed to prove that damages and other alternative remedies would be inadequate here. We conclude, there is an inherent public interest in the reliability of supply in the Basin. For that reason, compensatory damages would fail to provide adequate redress for the harm caused to respondents' unique water rights in the Basin. Finally, a bond or undertaking by appellants would not address the irreparable harm being caused to respondents, and would not be appropriate for these circumstances.

Appellants argue that the public interest weighs more in their favor than respondents for the purpose of determining the adequacy of remedies. However, while both respondents and appellants can claim they are trying to protect the public interest of their customers, the public interest is not served by illegal extractions from the Basin. Even if the public interests served by appellants outweighed those served by respondents, the Court must still consider the adequacy of money damages as an independent remedy. (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 377, citing *Newport v. Temescal Water Co.* (1906) 149 Cal. 531, 538.)

Water rights are considered an interest in real property, and money damages generally are not considered an adequate remedy where real property is involved. (*State v. Superior Court* (2000) 78 Cal.App.4th 1019, 1025; *Tehachapi-Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 999, fn. 5; *Fonteno v. Wells Fargo*

23

*Bank, N.A.* (2014) 228 Cal.App.4th 1358, 1380.) Appellants also assert that respondents "submitted no evidence of the difficulty of calculating damages." However, such evidence is unnecessary if money damages would not adequately cure the injury caused to respondents' rights in real property. As previously stated, because water rights qualify as real property, money damages cannot serve as an adequate remedy for the declining water levels and the resulting damage caused to respondents.

Like money damages, a bond would also not provide an adequate remedy. A monetary bond will not raise the water levels in the Basin or allow respondents to pump their full rights under the 1961 Decree during the pendency of this case. A surety will not alleviate the harm to the Basin's water supply. Furthermore, the purpose of an undertaking is to cover any potential damages caused by the issuance of an injunction. (Code Civ. Proc., § 529; *Top Cat Productions, Inc. v. Michael's Los Feliz* (2002) 102 Cal.App.4th 474, 478.) A bond is not meant to be a substitute for a preliminary injunction as appellants propose here. Finally, a bond would have the effect of compelling respondents to take steps to replenish the Basin to cover appellants' continued violations of the 1961 Decree.

*6. Physical Solution*

Appellants also argue it violated the California Constitution for the trial court to grant a preliminary injunction without considering a "physical solution." Appellants

24

incorrectly conflate a permanent injunction with a preliminary injunction. Furthermore, the 1961 Decree is a physical solution.

A "physical solution" is simply a court's exercise of its equitable authority to ensure that the use of water meets the constitutional requirement of placing the waters of the State "to beneficial use to the fullest extent of which they are capable," preventing the waste or unreasonable use of water, and conserving water for the reasonable and beneficial use in the public interest. (See *Rancho Santa Margarita v. Vail*, *supra,* 11 Cal.2d at pp. 558-559; Cal. Const., art. X, § 2.) "The phrase 'physical solution' is used in water rights cases to describe an agreed-upon or judicially imposed resolution of conflicting claims in a manner that advances the constitutional rule of reasonable and beneficial use of the state's water supply." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287.)

A preliminary injunction is a provisional remedy issued to preserve the status quo pending a trial on the merits. (*Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342, 1352-1353.) In contrast, a permanent injunction constitutes the ultimate relief on the merits. (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 800.) A physical solution is a form of a permanent injunction: "In working out a physical solution to water shortages . . . [a court] has the power, by injunctive order, to cause the change to be accomplished." (62 Cal.Jur.3d

25

(2015) Water, § 456; see *Central Basin Municipal Water Dist. v. Water Replenishment Dist. of Southern California* (2012) 211 Cal.App.4th 943, 950.)

According to appellants, "the court should not grant an injunction until every reasonable physical solution, and every reasonable source of supply, has been thoroughly investigated," citing *Rancho Santa Margarita v. Vail, supra,* 11 Cal.2d at page 556. However in *Vail*, the principal case relied on by appellants, the court granted a permanent injunction entered as a final judgment in the action, not a preliminary injunction. (*Id.* at pp. 517-518.) Similarly, *City of Lodi v. East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316, also involved a permanent injunction decree that constituted the ultimate relief in the action following trial. (*Id*. at p. 344.) Finally, *Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.* (1935) 3 Cal.2d 489, involved an appeal from a permanent injunctive decree. (*Id.* at pp. 517, 527.) Accordingly, a physical solution is only appropriate as a permanent not preliminary injunction.

In any event, a suitable physical solution already exists. The 1961 Decree, and its self-correcting plan for maintaining water levels in the Basin, currently operates as a comprehensive physical solution to protect the Basin is from exhaustion and unconstitutional waste. The constitutional standard is satisfied by the preexisting physical solution that remains in place. Thus, the trial court's ruling that the 1961 Decree is "an attempt to establish a physical solution to the overdraft issue that was apparent in 1961" is sound.

26

Appellants argue that the 1961 Decree is not a sufficient physical solution because it does not regulate water use by overlying users, discuss a safe yield, account for an alleged surplus of water, address supplemental water, or assess recharge options, among other things. However, these considerations are not necessary for the granting of a preliminary injunction even if the trial court should ultimately impose a permanent physical solution to resolve these conflicting claims and to prevent unconstitutional waste of water.

V

DISPOSITION

Appellants' production from the Rialto Basin exceeded 2,520 acre-feet during the 2013/2014 water year and nearly exceeded that amount early in the 2014/2015 water year when the preliminary injunction was entered. There is no factual dispute that the spring high-water levels have for several years declined below the level requiring the parties to restrict their pumping as established by the 1961 Decree. The trial court did not abuse its discretion in granting the preliminary injunction. We affirm the trial court's order. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

HOLLENHORST

Acting P. J.

27

McKINSTER

J.